ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
KEVIN A. SEELY (199982)
ASHLEY R. RIFKIN (246602)
LEONID KANDINOV (279650)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        kseely@robbinsarroyo.com
        arifkin@robbinsarroyo.com
        lkandinov@robbinsarroyo.com

Attorneys for Plaintiff

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELUX CAB, LLC d/b/a NATHAN CAB, SDC DELUX CAB, and LUX CAB, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC., UBER USA, LLC, RASIER, LLC, and RASIER-CA, LLC,<br><br>　　　　　　Defendants. | Case No.: **'16CV3057 CAB JMA**<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Delux Cab, LLC d/b/a/ Nathan Cab, SDC Delux Cab, and Lux Cab ("Delux Cab" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through its undersigned counsel, hereby brings this action against Uber Technologies, Inc., Uber USA, LLC, Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber" or the "Company"). Plaintiff alleges the following upon its own knowledge, or where it lacks personal knowledge, upon information and belief, including the investigation of its counsel.

## INTRODUCTION

1. Plaintiff Delux Cab is an independent California entity operating seven taxicabs in San Diego, California. Delux Cab maintains its headquarters and principal place of business in the City and County of San Diego, California.

2. Uber is a transportation network company ("TNC") that competes with taxicab services such as Delux Cab. Specifically, the Company develops, markets, and operates an online-enabled smartphone application and platform (the "Uber App") that connects passengers with drivers who provide transportation services in their personal vehicles. Customers use the Uber App to submit a trip request and the Uber App then automatically sends the request to the Uber driver nearest to the customer, including information on the customer's name, location, and desired destination. The Uber driver then picks up and transports the customer, and the customer is charged a fee for the ride which is proportioned between Uber and the driver. As of August 2016, the service was available in sixty-six countries and 507 cities worldwide, including San Diego, California.

3. For years, Uber has engaged in a campaign premised on false or misleading representations that were intended to and did persuade customers to use Uber rather than taxicabs. Specifically, Uber repeatedly touted false and misleading advertisements regarding the purported exceptional safety of Uber, while at the same time falsely disparaging the safety of taxicab rides offered by

taxicab companies such as Delux Cab.  For example, Uber's website boasted for years that Uber has the "safest rides on the road," the Company has "the strictest safety standards possible," and that the background checks for Uber drivers were "rigorous" and backed by "industry-leading standards."  The Company's has also proclaimed "confiden[ce] that every ride on the Uber is safer than a taxi."  More, in order to further bolster consumers' expectations that Uber provides the safest ride possible, Uber charged millions of customers a $1 "Safe Rides Fee" per ride over the span of multiple years.

4. Uber's repeated disparaging remarks were blatantly false and/or misleading when made.  As an initial matter, Uber's safety claims are not backed by empirical data.  In fact, as has been widely reported by various news sources, there is very little reliable information available anywhere concerning the frequency of safety breaches in Uber rides or taxicab rides, including with respect to comparative statistics.  Nonetheless, while data comparing the safety of Uber verses taxicabs is not readily available, as detailed further herein, taxicab drivers are typically subject to substantially more rigorous safety training and qualification testing requirements than Uber drivers, including in San Diego.  Given the heightened requirements for taxicab drivers, taxicabs are likely the safer transportation option as compared to Uber.

5. In any event, Uber's claims that driver background checks are more rigorous than taxicab background checks are demonstrably false.  For example, while most cities, including San Diego, require taxicab companies to run fingerprint-based background checks of their drivers through the U.S. Department of Justice and Federal Bureau of Investigation systems, Uber does not.  Rather, potential Uber drivers are merely required to remotely provide certain personal information to the Company through Uber's website, which Uber then sends to one or more third-party services to purportedly perform a background check.  As a

result, according to a recent comprehensive and peer reviewed report (the "TNC Safety Report"),[1] Uber's background checks have an astonishing estimated error rate of approximately 43% compared to an estimated 1% error rate found for the background checks utilized by most taxicab companies.

6. On December 9, 2014, District Attorneys in San Francisco and Los Angeles filed a complaint against Uber in San Francisco Superior Court on behalf of the People of the State of California (the "District Attorneys' Lawsuit"). The District Attorneys' Lawsuit focused in large part on Uber's deception pertaining to its background checks, specifically noting that "Uber's representations concerning the quality of its background check process are untrue or misleading." As part of the suit, which Uber ultimately settled for $25 million, California regulators uncovered evidence that Uber failed to screen out twenty-five drivers with criminal records, including convictions for kidnapping and murder. Further, the Company agreed to stop using terms such as "the safest ride" in its promotions. Unfortunately for Delux Cab and the Class (as defined below), the damage has already been done.

---

[1] The May 2015 report titled, "One Standard for All – Criminal Background Checks for Taxicab, For-Hire, and Transportation Network Company (TNC) Drivers," was prepared by several people with extensive experience in law enforcement, government, law, and technology, and reviewed by an exemplary panel of academics, criminalists, law enforcement officials, and security experts, including: Hon. Michael A. L. Balboni, former Deputy Secretary for Public Safety for New York State, former New York State Senator, and Chair of the New York State Senate Committee on Veterans, Homeland Security and Military Affairs; Professor William J. DiVello, former Executive Director, Office of Integrity and Oversight for the District of Columbia Chief Financial Officer; Professor Lawrence Kobilinsky, Professor and Chairperson of the Department of Sciences, John Jay College of Criminal Justice, CUNY; and Professor Philip Zisman, Executive Director of the Association of Inspectors General and former Inspector General for the City of Yonkers.

## JURISDICTION AND VENUE

7. Plaintiff brings this action to obtain injunctive relieve, damages, restitution, disgorgement, and reasonable attorney's fees and costs, arising from Uber's violation of the Lanham Act, 15 U.S.C. §1125.

8. This Court has subject matter jurisdiction over all causes of action asserted herein under pursuant to 28 U.S.C. §1331 because this matter includes claims under federal statutes.

9. This Court has personal jurisdiction over all defendants because they are registered with the California Secretary of State to do business in California, are doing business in California, and/or have otherwise intentionally availed themselves of the California market so as to render the exercise of jurisdiction by this Court proper.

10. Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiff resides and suffered injury as a result of defendants' acts in this district, many of the acts and transactions giving rise to this action occurred in this district, defendants conduct substantial business in this district, defendants have intentionally availed themselves of the laws and markets of this district, and defendants are subject to personal jurisdiction in this district.

## THE PARTIES

11. Plaintiff Delux Cab is an independent California entity operating seven taxicabs in San Diego, California. Delux Cab maintains its headquarters and principal place of business in the City and County of San Diego, California.

12. Defendant Uber Technologies, Inc. ("Uber" or the "Company") is a Delaware corporation with principal executive offices located at 1455 Market Street, 4th Floor, San Francisco, California. Defendant Uber's primary business offering is its smartphone application which connects drivers with users who

request a ride. Defendant Uber serves customers in North and South America, Europe, the Middle East, Africa, and Asia.

13. Defendant Uber USA, LLC ("Uber USA") is a Delaware corporation with principal executive offices located at 1455 Market Street, 4th Floor, San Francisco, California. Defendant Uber USA is a subsidiary of defendant Uber.

14. Defendant Rasier, LLC ("Rasier") is a Delaware corporation with principal executive offices located at 1455 Market Street, 4th Floor, San Francisco, California. Defendant Rasier is a wholly owned subsidiary of defendant Uber.

15. Defendant Rasier-CA, LLC ("Rasier-CA") a Delaware corporation with principal executive offices located at 1455 Market Street, 4th Floor, San Francisco, California. Defendant Rasier-CA is an affiliate of defendant Rasier and a subsidiary of defendant Uber.

## CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action individually and on behalf of the following class pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons or entities licensed or permitted to operate taxicab services in the City of San Diego, California, in the past four years (the "Class").

17. Excluded from the Class are the defendants, any of their parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

18. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

19. The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class members in a single action will provide substantial benefits to the parties and Court.

20. Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

(a) whether defendants represented that Uber is safer than taxicabs;

(b) whether defendants represented that Uber's background checks were "rigorous" and backed by "industry leading standards."

(c) whether defendants' representations presented false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the characteristics or qualities of Uber's, Plaintiff's, or the Class' goods, services, or commercial activities;

(d) whether those representations are likely to deceive a reasonable consumer;

(e) whether defendants had knowledge that those representations were false, deceptive, and misleading;

(f) whether defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(g) whether defendants' representations are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(h) whether Plaintiff and the Class were harmed by defendants' false and misleading representations;

(i) whether defendants violated the Lanham Act, 15 U.S.C. §1125;

(j) whether defendants were unjustly enriched;

   (k) whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages; and

   (l) whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

 21. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

 22. Plaintiff's claims are typical of Class members' claims in that they are based on the same underlying facts, events, and circumstances relating to defendants' conduct.

 23. Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

 24. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class member is small such that, absent representative litigation, it would be infeasible for Class members to redress the wrongs done to them.

 25. Questions of law and fact common to the Class predominate over any questions affecting only individual Class members.

 26. As a result of the foregoing, Class treatment is appropriate.

### PLAINTIFF AND THE CLASS COMPETE WITH UBER FOR CUSTOMERS

 27. Plaintiff and the Class are licensed to operate taxicab services in San Diego County and are authorized to provide transportation services in exchange for

compensation in San Diego County.

28. Uber operates a separate transportation network that provides transportation services in exchange for compensation in many cities throughout the United States and internationally. Uber launched its San Diego service in or about mid-2012.

29. Uber is a direct competitor of Plaintiff and members of the Class, and has been since the Company launched its San Diego service.

**UBER REPEATEDLY MISREPRESENTED THAT UBER'S SAFETY AND BACKGROUND CHECKS ARE FAR SUPERIOR TO TAXICABS**

30. Plaintiff, members of the Class, and Uber all heavily rely upon ensuring that customers trust their lives and personal safety to unknown drivers who are often hired to pick up or drop off customers at their personal homes or other personal safe havens. As detailed below, in order to induce customers to use Uber rather than competing taxicab services, Uber knowingly engaged in a multi-year pattern of deceit concerning the purported superior safety of Uber and the Company's "industry leading" background check standards, while at the same time falsely disparaging the safety and background check standards of competing taxicab companies. Below are a few examples of Uber's numerous misleading statements and false advertisements.

31. For several years and continuing through at least May 2016, Uber's prominent "Safety" webpage on the Company's website represented, under the tagline "SAFEST RIDES ON THE ROAD – Going the Distance to Put People First," that "*[w]herever you are around the world*, Uber is committed to connecting you to the *safest ride on the road*." The website also boasted that Uber sets "the strictest safety standards possible," and further explained that:

> The specifics vary depending on what local governments allow, but *within each city we operate, we aim to go above and beyond local*

- 8 -

> *requirements to ensure your comfort and security* – what we're doing in the US is an example of our standards around the world.

32. Uber also repeatedly boasted to the media about the supposed superior safety of Uber rides and background checks. For example, on April 24, 2014, Lane Kasselman ("Kasselman"), Uber's Head of Communications, bragged to NBC that: "***We're confident that every ride on the Uber is safer than a taxi***."

33. Similarly, Uber's Senior Communications Associate, Central North America, Lauren Altmin, issued a statement to NBC which stated, in part, as follows:

> What I can tell you is that Uber takes passenger safety very seriously. We work every day to connect riders with ***the safest rides on the road*** and go ***above and beyond local requirements in every city we operate***.
>
> Uber only partners with drivers who pass an ***industry-leading*** screening that includes a criminal background check at the county, federal, and multistate level going back as far as the law allows. We also conduct ongoing reviews of drivers' motor vehicle records during their time as an Uber partner.... For more information on what makes ***Uber the safest rides on the road***, please see our website....

34. Uber's supposed "industry-leading" background checks and superiority with respect to safety were again touted in an April 29, 2014 *Mashable* article entitled, "Faulty Background Checks May Put UberX Passengers at Risk, Report Says." Specifically, Uber's Head of Communications, Kasselman, stated:

> ***Uber's industry-leading background checks*** help connect consumers with the ***safest ride on the road***.... ***Our driver-partner background checks are more thorough than those of taxis*** in most cities and include county, state and federal screens going back seven years. We continue to improve and are always working hard to tighten our policies and processes to ensure that ***Uber remains the safest transportation option available***.

- 9 -

35. The Company's false representations continued for years. For example, on April 25, 2014, Kasselman made the following representations in a blog post:

> All Uber ridesharing and livery partners must go through a rigorous background check. The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has *set a new standard*.... We apply this comprehensive and *new industry standard* consistently across all Uber products, including UberX.
>
> Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. *Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver*.

36. In order to reinforce the Company's false superior safety proclamations, from about April 2014 through about March 2016, Uber charged consumers using its UberX service option, the most popular and economical option, a $1 "Safe Rides Fee." After an UberX ride was completed, the "Safe Rides Fee" was separately itemized on an electronic receipt sent to the consumer via Uber's smartphone application and via e-mail. Next to the words "Safe Rides Fee" on the receipt was a hyperlink prompting customers to learn about Uber's justification for the additional $1 "Safe Rides Fee." According to the hyperlink, the "Safe Rides Fee" was used to support, among other things, Uber's "continued efforts to *ensure the safest possible platform* for Uber riders and drivers, including an *industry-leading background check process*, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."

# UBER'S REPRESENTATIONS CONCERNING THE SUPERIOR SAFETY AND BACKGROUND CHECKS OF UBER AS COMPARED TO TAXICABS WERE KNOWINGLY FALSE WHEN MADE

**Uber's Superior Safety Claims Are Not Backed by Empirical Data**

37.    Over the past several years, multiple journalists have unsuccessfully attempted to investigate which are safer, Uber or taxicabs. For example, on March 3, 2015, after "[a]nother Uber driver [was] arrested for sexual assault," *The Atlantic* published an article entitled, "Are Taxis Safer Than Uber?" Journalists from *The Atlantic* contacted several police departments for various major cities and found that "there's no data [available] to compare reports against Uber drivers verses taxi drivers or limo drivers."

38.    Similarly, on February 26, 2016, following a deadly shooting rampage by an Uber driver in Kalamazoo, Michigan, the *Las Vegas Sun* published an article entitled, "Which is Safer – Uber or a Taxi? There's No Clear Answer." According to that article, "[p]olice and transportation authorities around the U.S. say they know of no rigorous comparison of cabbies and Uber drivers." In fact, when the *Las Vegas Sun* specifically asked Uber's own Head of Safety and Public Policy, Dorothy Chou, which is safer, she dodged the question while also essentially admitting that Uber was not safer than taxicabs, stating "[a]s long as we keep innovating … eventually it will definitely be safer to take a ride-sharing vehicle [such as Uber]."

**Taxicab Licensing and Driving Requirements Are Significantly Stricter than the Requirements to Become an Uber Driver**

39.    As noted above, Uber touts that the Company "go[es] above and beyond local requirements in every city [the Company] operate[s]." However, in most cities, including San Diego, taxicab drivers are subject to significantly stricter requirements than Uber drivers.

- 11 -

40. In San Diego, like in most cities in the United States, taxicab drivers are required to complete safety training and qualification testing. Specifically, prospective drivers must participate in a Driver Safety Training course through Foundation Community Services which focuses on safety, crime reduction, and city geography. After attending the safety training course, drivers are required to pass two exams also administered through Foundation Community Services: one focuses on driver safety while the other exam assesses the driver's knowledge of city geography. Additionally, the Department of Transportation requires that all taxicab drivers must be drug tested at the time of licensing as well as on an ongoing random basis, and substance abuse test results are required to be submitted to the San Diego Sheriff's Department at the time of application for a taxicab driver's identification card.

41. Unlike San Diego taxicab drivers, Uber drivers are not required to take any safety training or qualification testing, and are not subject to drug testing as a condition of working as Uber drivers. Rather, according to the Company's website, applicants are only required to be at least twenty-one years of age, use an eligible four-door vehicle, and have at least one year of driving experience if over twenty-three years of age or three years of driving experience if under twenty-three years of age.

**Taxicab Background Checks Are Far Superior to Uber Background Checks**

42. Uber's background check process falls far behind that of most taxicab companies, including Plaintiff and members of the Class. In most major cities in the United States, taxicab drivers are required to pass fingerprint-based background checks conducted by state or local authorities. In San Diego, the background check is conducted in person through the California Department of Justice, Federal Bureau of Investigation, and other local agencies.

43. In stark contrast, Uber pays a private company to perform background checks on applicant names and social security numbers that access public records through the Internet. Uber does not even meet with prospective drivers in person. Rather, the application is simply submitted online through Uber's website, and the Company does not take any reasonable steps to ensure that applicants are who they represent themselves to be.

44. Conducting thorough criminal background checks on drivers who transport passengers is crucial to keeping passengers safe. Passengers are frequently alone with these drivers in their vehicle, while being exhausted, inebriated, or traveling in a strange city makes them even further vulnerable.

45. Shockingly, the TNC Safety Report found that ***name-based background checks such as those used by Uber are forty-three times more likely to have errors than the fingerprint-based checks used by taxicab companies such as Plaintiff and the Class***. The TNC Safety Report further notes that "[Uber's] policy of relying on name checks for checking courthouse records, multi-state criminal records and driving records opens [it] up to the possibility of errors and perhaps to the possibility that at least 12% of their new drivers each year have [an undiscovered] federal offense listed in their criminal record." Indeed, as a result of Uber's inferior background checks, multiple felons have been proven time and time again to be behind the wheel of Uber vehicles.

46. Consequently, Uber's marketing statements that its background check process "leads the industry" and that riding with an Uber driver is "safer than a taxi," are patently false. In fact, in January 2016, Uber agreed to pay $28.5 million to settle a consolidated class action brought on behalf of consumers who claimed, among other things, that Uber's marketing of the $1 charge as a "Safe Rides Fee" constituted false advertising. Thereafter, in March 2016, Uber agreed to pay as much as $25 million as a civil penalty in the District Attorneys' Lawsuit. The

1  District Attorneys' Lawsuit focused in large part on Uber's deception pertaining to
2  its background checks, specifically noting that "Uber's representations concerning
3  the quality of its background check process are untrue or misleading."

4  47. As part of the above-noted settlements, Uber discontinued use of the
5  term "Safe Rides Fee" and replaced it with the term "Booking Fee," which Uber
6  described as covering safety initiatives and other operational costs.

## COUNT I

**(Against Uber for Violations of the Lanham Act, 15 U.S.C. §1125(a)(1)(B))**

48. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

49. Uber's false advertising violates the Lanham Act, codified at 15 U.S.C. §1125(a)(1)(B), which states:

> Any person who, on or in connection with any goods or services … uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any … false or misleading description of fact, or false or misleading representation of fact, which – in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

50. As detailed herein, Uber made numerous false or misleading statements concerning the supposed superior safety of its transportation services and the superiority of its background checks. Uber also made numerous false or misleading statements disparaging the safety and background checks of taxicab services.

51. Uber's statements actually deceived or had the tendency to deceive a substantial segment of their audience.

52. Uber's deceptions, which entered interstate commerce, were material in that they were likely to influence the decisions of transportation customers.

53. Uber's misrepresentations were made in direct comparison to competitors in the taxicab industry, including Plaintiff and the Class, and were intended to induce customers to choose Uber's products and services at the expense of the taxicab industry, including Plaintiff and the Class.

54. As a direct result of Uber's false or misleading representations, customers were induced to choose Uber's products and services over the products and services of the taxicab industry, including Plaintiff and the Class.

55. Pursuant to 15 U.S.C. §1117(a), Plaintiffs and the Class seek a recovery of Uber's profits in San Diego County and compensatory damages, including all remedies for the diminution in value of taxicab licenses, together with interest, costs, and other such relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for judgment against defendants, including:

A. An order declaring this action to be a proper class action, appointing Plaintiff and its counsel to represent the Class, and requiring defendants to bear the costs of class notice;

B. An order enjoining defendants from offering their services in any manner suggesting or implying that they are safer than the services provided by taxicabs, or that defendants' background checks are in any manner better than the background checks utilized by taxicabs;

C. An order requiring defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief;

D. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining

1  defendants from continuing the unlawful practices alleged herein, and injunctive
2  relief to remedy defendants' past conduct;

3     E.    An order requiring defendants to pay restitution to restore all funds
4  acquired by means of any act or practice declared by this Court to be a violation of
5  the Lanham Act;

6     F.    An order requiring defendants to disgorge or return all monies,
7  revenues, and profits obtained by means of any wrongful or unlawful act or
8  practice;

9     G.    An order requiring defendants to pay all actual and statutory damages
10  permitted under the causes of action alleged herein;

11     H.    An order requiring defendants to pay punitive damages on any cause
12  of action so allowable;

13     I.    An order awarding attorneys' fees and costs to Plaintiff and the Class;
14  and

15     J.    An order providing for all other such equitable relief as may be just
16  and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 19, 2016

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
ASHLEY R. RIFKIN
LEONID KANDINOV

/s/*Brian J. Robbins*
BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com

kseely@robbinsarroyo.com
arifkin@robbinsarroyo.com
lkandinov@robbinsarroyo.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Robert K. Shelquist
Rebecca A. Peterson
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
          rapeterson@locklaw.com

Attorneys for Plaintiff

1137361